**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DAWANYIA SLAYTON**, individually and on behalf of a class of persons similarly situated, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**IOWA COLLEGE ACQUISITION CORP.**, )<br>a Delaware corporation, d/b/a **KAPLAN** )<br>**UNIVERSITY**, and also d/b/a **KAPLAN** )<br>**UNIVERSITY GROUP**, )<br>)<br>Defendant. ) | No. 09-cv-06977<br><br>Judge George W. Lindberg<br>Magistrate Judge Susan E. Cox |

**DEFENDANT'S MEMORANDUM IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff Dawanyia Slayton's motion for class certification is supported by neither the facts nor the law. The gist of Slayton's complaint is that she was "discouraged" from recording time that she spent at work booting up her computer, and that occasionally she was asked to stay after her shift but was not paid for that work. But Slayton does not cite any handbook, instructions, policy or practice showing that Defendant Iowa Acquisition Corp., d/b/a Kaplan University ("KU") engaged in any such "practice or course of conduct." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Instead, Slayton relies on her own anecdotal deposition testimony and two undated conclusory declarations. As this Court has held, testimony of "a handful of employees regarding isolated incidents with managers does not present a question of fact common to the class." *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 308 (N.D. Ill. 2010). By contrast, the factually specific declarations KU submits with this Memorandum clearly show that KU did ***not*** "engage in [the] standardized conduct towards members of the proposed class" that Slayton alleges. *Id.*

12654495v.5

Further, because Slayton and every other putative class member was or is paid based on the time *they themselves record,* questions of law or fact are not common and cannot predominate. Whether any particular class member was "discouraged" from recording all of his or her time, or was not paid overtime for work in excess of 40 hours, would require individual proof. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Reed v. Advocate Health Care*, No. 06 C 3337, 2009 WL 3146999, at *4 (N.D. Ill. Sept. 28, 2009), *citing In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).

Accordingly, Slayton's motion for class certification should be denied.

## BACKGROUND

### I. Kaplan University

KU offers a variety of degree and certificate programs, ranging from high school diplomas to master's degrees. These programs are offered online or at one of KU's eight campuses, all of which are located outside Illinois. (Mauricio Decl. ¶ 2). The role of Admissions Advisors is to contact prospective students and help them enroll into an appropriate program. (*Id.* ¶ 3). KU first hired Admissions Advisors in Illinois in 2004, and since then has employed approximately 1,200 Admissions Advisors in the state. Admissions Advisors have always been classified as non-exempt employees. (*Id*).

### II. Admissions Advisors Report Their Own Time, and Are Instructed to Record All Time Worked

Admissions Advisors have always been responsible for tracking and reporting their own time, and since 2004 they have used two different timekeeping systems to do so. Until June 2007, Admissions Advisors recorded their start, end, and break times manually on paper timesheets. (Rogoff Dep. at 31, 48-50). Since June 2007, Admissions Advisors have

2

recorded their hours worked electronically through a computer-based timekeeping system called PeopleSoft. (*Id.* at 31-33). Although employees are told to record their time daily, their practices vary. (*See, e.g.,* Nilsson Dep. at 24 ("My goal was to enter my time every day. That did not always happen."); Houston Decl. ¶ 8 (records time every "couple of days")).

Admissions Advisors "are instructed to report all of the time that they work," including "the time that an employee spends turning on their computer" and handling student calls after the end of their shifts. (Rogoff Dep. at 41-44, 86-87).[1] They are instructed to record this time even if it falls outside of their scheduled hours or results in them working overtime. (Nilsson Dep. at 33-35, 58). As KU's 30(b)(6) witness, Howard Rogoff, testified: "If they walk in the door and their manager asks them a question before they sit in their physical chair, then they would be compensated from the time that they walked in." (Rogoff Dep. at 43).

### III. Admissions Advisors Are Not Expected to Arrive Before Their Scheduled Shifts

Admissions Advisors are not expected to arrive at work before their scheduled start times. So it is "perfectly acceptable" for Admissions Advisors to arrive the moment their shifts begin, even if their computers and work systems are not up and running. (Nilsson Dep. at 31; *see also* 30-33, 76-77; Rogoff Dep. at 64). Instead, Admissions Advisors are only expected to be logged into either their telephone, or a computer application called the "Kaplan agent toolbar," within five minutes of their scheduled shift (unless there is a system issue).[2] Admissions Advisors estimate that logging into the phone takes a few seconds; logging into the toolbar typically takes between 15 seconds and 2-3 minutes. (Flink Decl. ¶ 8; Small Decl. ¶ 7). Thus, even if Admissions Advisors arrive at the office a few minutes after their shifts start, they are

---

[1] This policy applies to KU's other hourly employees as well. (Diaz Dep. at 29-30, 49-50, 68).

[2] To log into the telephone, Admissions Advisors punch their employee number into a phone located at their desk. To log into the toolbar, Admissions Advisors log into their computer, click on the toolbar icon, and enter their employee name and password. (Ford Decl. ¶ 8).

3

12654495v.5

still considered on time if they log into the phone or the toolbar within the grace period. (Deemer Decl. ¶ 6; Houston Decl. ¶ 6.) Whether Admissions Advisors log into the phone or the toolbar is entirely up to them, and their practices vary. (Flink Decl. ¶ 8; Whatley Decl. ¶ 7).

Admissions Advisors' arrival times also vary (Pl. Dep. at 99-100; Whatley Decl. ¶ 5), and many do not arrive at work until just before or at their scheduled start time. (Deemer Decl. ¶ 4; Lerash Decl. ¶ 5). Moreover, if and when Admissions Advisors arrive early, some engage in different non-work activities. Some eat breakfast or grab coffee; others chat with co-workers. (Nilsson Dep. at 36 (would have coffee and socialize when he arrived early); Houston Decl. ¶ 4 (eats breakfast when he arrives early)). But if Admissions Advisors start working before their start time, they record and are paid for that time. (Deemer Decl. ¶ 4; Sherrod Decl. ¶ 4).

## IV. Plaintiff's Work Experience and Her Allegations

KU employed Slayton as an Admissions Advisor from May 2005 to October 2006, when she was discharged for insubordination. (Mauricio Decl. ¶ 4). In her deposition, Slayton stated that she does not remember if she ever received any instructions on KU's timekeeping or overtime policies, or on how to record her hours worked. (Pl. Dep. at 43, 45, 73).

While at KU, Slayton only used the manual timekeeping system. So she was responsible for recording her start, break, and end times each day (*Id.* at 66, 68), and she reviewed her timesheets before confirming they were "an accurate accounting of the total time that [she] worked during the pay period." (*Id.* at 60-61; Pl. Dep. Ex. 5). Slayton testified that she recorded her time once, at the end of each two-week period, filling in the number of hours for each day in the period. (Pl. Dep. at 66). Slayton never took notes or did "anything to record the time that [she] actually worked" on any given day. (*Id.* at 67). Rather, when she filled out her timesheets every two weeks, she simply recorded her scheduled shift time plus any overtime that had been approved in advance. (*Id.* at 67, 72-73).

4

Slayton was always scheduled to work five eight-hour shifts (with a one-hour break), for a total of 40 hours per week. (*Id.* at 57-58). Yet Slayton regularly recorded more than eight hours a day and regularly received overtime. For example, Slayton produced her earnings statements from nine, two-week pay periods while she worked at KU. With one exception, she recorded and received overtime in every pay period, and in varying amounts. (*Id.* at 79; Pl. Dep. Ex. 6). Slayton admitted that she was always paid for the time she recorded on her timesheets. (Pl. Dep. at 75-76). Nonetheless, Slayton now claims that she was not properly compensated in two ways: (i) the time it allegedly took her to boot up her computer; and (ii) post-shift work.

### A. Computer Log-In Time

First, Slayton claims that she was underpaid because ***she did not record*** the time it took her to log on to her computer and open up three computer applications (Genesys, Orion, and the Kaplan agent toolbar) every day. (Pl. Dep. at 92-96). Slayton claims that she was never given a grace period to log into these systems, and does not remember how long it took her to log into them or if she had the option of logging into the phone instead. (*Id.* at 96-97, 103). Although Slayton claims she did not record this log-in time, she admitted that she was never instructed not to do so, and that she does not know if other employees recorded it:

> Q: Do you remember any conversations with managers where you were told that you were not allowed to record the time that you spent logging into the programs?
> A: No.
> Q: Do you know if other employees recorded the time they spent logging into the computer programs?
> A: No.

(*Id.* at 107-08).

In fact, ***other Admissions Advisors did, and do, record their log-in time***. Slayton deposed Martin Nilsson, who was a KU Admissions Advisor in 2005 and 2006. (Nilsson Dep. at 20). Nilsson testified that "my directions were to fill out the time that I had worked" and that he

5

was not required to be logged-in at the start of his shift. (*Id.* at 31, 33). Nilsson testified that he would "add" any work outside his regular shift to his time. (*Id.* at 34-35). Slayton also deposed Julie Diaz, an hourly Admissions Coordinator in 2005 and 2006. (Diaz Dep. at 6, 14-16). Diaz testified: "If I was working prior to 9:00 o'clock, I would record it," and she considered "booting up a program" on a KU computer to be working. (*Id.* at 48-49, 68; *see also* 50-51). Diaz also testified that no one ever instructed her not to record computer log-in time. (*Id.* at 68).

In addition to this testimony, KU has obtained declarations from ten other current or former Admissions Advisors in Illinois. (*See* Ex. A). These declarations all confirm that Admissions Advisors have never been expected to log into any computer programs before their shifts; that they have always been instructed to record log-in time as hours worked (regardless of when they do it); and that they have, in fact, always recorded and been paid for their log-in time. (*See, e.g.,* McCain Decl. ¶¶ 4, 8, 9; Flink Decl. ¶¶ 6, 10, 11; McKeithen Decl. ¶¶ 5, 9, 10, 12).

Slayton's two declarants, Montell Wyer and Andranee Kency, do not fill any gaps in her testimony. Neither declaration identifies any specific instance of a KU manager or policy stating that log-in time should not be recorded. Both simply make general and conclusory assertions. For example, the focus of Wyer's declaration is that his managers "never directed or encouraged him" to record log-in time: which is not at all the same as saying that they directed him not to, or discouraged him from, recording that time. (Wyer Decl. ¶¶ 9-10). Likewise, Wyer's and Kency's assertions that Admissions Advisors were told to be logged in by the start of their shifts not only contradicts the testimony of Nilsson, Diaz, and the declarations submitted by KU, but also is not the same as being "discouraged from recording [that log-in] time," as Slayton characterizes it. (Pl.'s Br. at 10). Kency offers no specifics or any foundation for her assertion

6

12654495v.5

that KU unilaterally reduced the number of hours recorded on Admissions Advisors' timesheets. In any event, Slayton does not contend that her hours were unilaterally reduced. (Pl. Dep. at 76).

### B. Post-Shift Work

Secondly, Slayton claims that her supervisors asked her to stay 30-60 minutes after her shift once a week in order to meet certain enrollment goals, but that *she did not record* that time. (*Id.* at 110-11). Again, Slayton admitted that she was never told not to record this time, and that she does not know if others recorded it:

> Q: And you reference your supervisors. Can you tell me which supervisors would ask you to work 30 to 60 minutes beyond the end of your shift while you worked for Kaplan?
> A: All of them.
> Q: Which ones told you that you weren't allowed to record your time?
> A: None of them.
> Q: So why didn't you record that time?
> A: Because my hours were 12 to 9, 12 to 9, 11 to 7, and 9 to 6.
> Q: Did you ever ask any of your managers if you could record that time?
> A: No.
> Q: Do you know if other employees recorded the time that they spent after their shift working on these days?
> A: No.
> Q: So it's possible that these employees recorded the time that they spent working after their shift?
> A: Yes, it's possible.

(*Id.* at 111-12).

In fact, *other Admissions Advisors did, and do, record the time they spent or spend working after their shifts*. Nilsson testified that when he was an Admissions Advisor, he added on to his timesheet any time he spent after his shift, even if it was not preapproved. (Nilsson Dep. at 33-34). Similarly, the ten declarations submitted by KU all confirm that Admissions Advisors record and are paid for any work they perform after their shifts, and none of these declarants has ever been required to stay beyond their scheduled shift. (*See, e.g.,* Sherrod Decl. ¶ 12; McCain Decl. ¶ 11; Whatley Decl. ¶¶ 12,13; Deemer Decl. ¶¶ 12, 13).

7

Neither of Slayton's declarants (Wyer or Kency) addresses this aspect of her complaint.

Despite allegedly working off the clock every day, Slayton never complained to or even informed anyone at KU that she was not being paid for all time worked. (Pl. Dep. at 75, 111, 119). In fact, while she was employed at KU and for nearly three years following her discharge, Slayton believed that she had been paid properly. It was not until she "became knowledgeable of the previous case with Kaplan" in June 2009 that she decided she had been underpaid. (*Id.* at 119). Although Slayton now believes that she was not paid properly, she admitted that she does not know if any other KU employees worked "off the clock." (*Id.* at 77, 120-21).

## ARGUMENT

**I.    Plaintiff Has the Burden to Show that Certification Is Appropriate Under Rule 23**

Slayton seeks to certify classes under the Illinois Minimum Wage Law (IMWL) and the Illinois Wage Payment and Collection Act (IWPCA). (Pl.'s Br. at 6-7). A plaintiff seeking class certification has the burden of proving that the proposed class meets Rule 23's requirements. *Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir. 2008). Slayton must first prove four elements: (1) joinder of all members is impractical because the class is so numerous, (2) questions of law or fact are common to the class, (3) her claims are typical of those of the class, and (4) she will fairly and adequately protect the interest of the class. Fed. R. Civ. P. 23(a). "All of these elements are prerequisites to certification; failure to meet any one of them precludes certification as a class." *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993).

Even if Slayton could meet this initial burden, she also would need to satisfy at least one of the subsections of Rule 23(b). *Driver,* 265 F.R.D. at 299. Slayton has moved to certify her classes under Rule 23(b)(3), which requires her to show "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual

8

members," and "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

"Class certification requires a rigorous investigation into the propriety of proceeding as a class." *Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553, 558 (7th Cir. 2003). In conducting this rigorous analysis, the Court must "make whatever factual and legal inquiries are necessary under Rule 23," even if those considerations overlap with the merits of the case. *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001). "[S]imilarity of claims and situations must be demonstrated rather than assumed." *Id.* at 677.

Here, the requisite rigorous analysis reveals that Slayton cannot satisfy the requirements of Rule 23. Accordingly, the Court should deny Slayton's motion for class certification.

## II. Plaintiff Has Failed to Satisfy the Requirements of Rule 23(a)

### A. Plaintiff Cannot Identify Questions of Law or Fact Common to the Class

Commonality requires a showing that the class claims arise from "[a] common nucleus of operative fact," and is satisfied where the defendant "engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). "However, if resolving the common legal issue depends on factual determinations that would require individualized inquiry for each class member, commonality is not met." *Parkis v. Arrow Fin. Servs.,* No. 07 C 410, 2008 WL 94798, at *4 (N.D. Ill. Jan. 8, 2008).

Here, Slayton contends that commonality is satisfied based on a list of generalized questions that are present in virtually any wage and hour complaint (e.g., "Whether Defendant violated the Illinois Minimum Wage Law").[3] (Pl.'s Mem. at 9). But "at a sufficiently abstract

---

[3] Slayton also alludes to KU's resolution of a prior lawsuit, *Lewis v. Iowa College Acquisition Corp.,* Case No. 08-CV-61011 (S.D. Fla. July 1, 2008), to support her motion. But *Lewis* was brought under the FLSA (which has a different and more lenient certification standard), and involved different plaintiffs, different offices, different supervisors, and different time periods. Additionally, KU stipulated

9

level of generalization, almost any set of claims can be said to display commonality. What [courts] are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998). None is present here.

Slayton has failed to identify any policy or practice that led to alleged off-the-clock work on a class-wide basis. She has not pointed to a written policy that prohibited Admissions Advisors from recording all hours worked. There is simply no such policy. Nor does she -- or any other declarant -- even contend that they were directed or asked by management to work off the clock. Slayton's testimony was clear: she simply recorded the hours of her shift, no more, no less, even though no one told her to do that. There is ample evidence, however, of Admissions Advisors who recorded all of their time, including pre-shift computer log-in time and post-shift time. As a result, whether Admissions Advisors were discouraged from recording all of their time would have to be determined on a class-member-by-class-member basis.

Further, as demonstrated by the declarations submitted by the parties, the experiences of Slayton and other putative class members are markedly different. To support her motion, Slayton offers declarations from two former employees, Kency and Wyer. Kency, who worked for KU as an Admissions Coordinator and Student Support Specialist until August 2008, states that an unidentified supervisor would sometimes return timesheets to her that had been changed, that an unidentified supervisor would inform Admissions Advisors that they would be considered tardy unless they were logged into various computer programs by the start of their scheduled shifts, that an unidentified person told Admissions Advisors that they would not be paid until

---

to a settlement class in *Lewis,* and therefore the Court did not undertake the kind of analysis required under Rule 23. *See, e.g., Smith v. Sprint Commc'ns Co.,* 387 F.3d 612, 614 (7th Cir. 2004) (certification of settlement class does not consider manageability). Accordingly, *Lewis* does not support Slayton's motion for a litigation class. *See McReynolds v. Lynch,* No. 05 C 6583, 2010 WL 3184179, at *10 n.4 (N.D. Ill. Aug. 9, 2010).

12654495v.5

they had completed the log-in process, and that she was never "encouraged" to record the time she spent on calls that ran past her shift. (Kency Decl. ¶¶ 2, 6, 9, 11, 16). Wyer, who worked as an Admissions Advisor until November 2007, states that he had to log into computer applications by the start of his shift, that he was never "encouraged" to record his log-in time, that an unnamed supervisor "returned a time card to [him] and asked [him] to change it because it had unauthorized overtime," and that he was not permitted to record the time he spent on calls that went past his shift. (Wyer Decl. ¶¶ 2, 5, 7, 9, 16).

But these declarations do not establish that KU engaged in standardized conduct towards members of the proposed classes, for several reasons. First, the declarations are based "on information and belief" (*see, e.g.,* Kency Decl. ¶¶ 10, 14; Wyer Decl. ¶¶ 12, 15), and are undated in violation of 28 U.S.C. § 1746. *See Gross v. Radioshack Corp.*, No. 04 C 4297, 2007 WL 917387, at *7 n.14 (N.D. Ill. Mar. 26, 2007) (rejecting declaration that, *inter alia,* was undated); *see also Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999) (rejecting affidavit containing hearsay, speculation, and conclusory allegations).

Second, the declarations are vague and conclusory, and therefore are insufficient to establish a company-wide policy or practice. *See McReynolds,* 2010 WL 3184179, at *7 (vague declarations "provide little support on the commonality issue"); *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *6, 10 (E.D. Wis. Sept. 11, 2008) (vague declarations were insufficient to show a common policy or practice).

Third, even if Plaintiff's two declarations -- out of a potential class of more than 1,200 -- had provided more detail, "[t]he declarations of a handful of employees regarding isolated incidents with managers does not present a question of fact common to the class." *Driver,* 265 F.R.D. at 308; *see also Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill.

11

2003) (evidence concerning pay practices with respect to two out of fifty putative class members did not amount to "even a 'modest factual showing' of a common policy or plan").

<u>Fourth</u>, the two declarations underscore the lack of commonality here. Slayton asserts that her supervisors made her stay 30-60 minutes after her shift once a week, but that she did not record this time. Neither Kency nor Wyer testify to a similar "requirement." Slayton also asserts that she was "discouraged" from recording her log-in time. By contrast, Kency and Wyer state that Admissions Advisors were never "encouraged" to record that time. (Kency Decl. ¶ 11; Wyer Decl. ¶ 10). Likewise, Kency insinuates that an unidentified supervisor altered timesheets, and Wyer states that his supervisor once asked him to change his timesheet. But Slayton does not make these claims and admitted she was always paid for the time on her timesheets. (Pl. Dep. at 75-76).

The declarations of the Admissions Advisors offered by KU establish additional differences between Slayton's alleged experience and those of the members of the putative classes. All ten declarants state that they: (1) have never been asked to arrive before their shifts start; (2) have never had to log-in to the computer before their shifts start; (3) have always been given a grace period before they are considered tardy; (4) were instructed to record all time worked, including time spent loading their computer applications; (5) have never been discouraged from recording any time worked; (6) have never had their self-reported time reduced or altered; (7) have never been required to work beyond their scheduled shifts; and (8) have always been paid properly. These declarations are factually specific, based on personal knowledge, and demonstrate that Slayton's experience of working off the clock was uncommon, if it happened at all.

### B. Plaintiff's Claims Are Not Typical of the Putative Class

"As with commonality, a comparison of the claims of the named plaintiff[] and the declarations of the putative class members show a lack of typicality." *McReynolds,* 2010 WL 3184179, at *8. The typicality requirement is closely related to the commonality requirement, *Keele,* 149 F.3d at 595, and is "meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) (quotations omitted). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *Id.*

As demonstrated above, Slayton's alleged off-the-clock work varies from the off-the-clock work allegedly performed even by her own declarants. And KU's declarations show that the alleged off-the-clock work of the Slayton was a rare occurrence and atypical of the experience of the classes she seeks to certify. Accordingly, the typicality requirement is not met.

## II. Plaintiff Has Failed To Satisfy The Requirements Of Rule 23(b)

Rule 23(b)(3) "requires two findings: predominance of common questions over individual ones and superiority of the class action mechanism." *Glazer v. Abercrombie & Kent, Inc.,* No. 07 C 2284, 2008 WL 4853641, at *3 (N.D. Ill. Nov. 10, 2008) (quotations omitted). Neither is present here.

### A. Plaintiff Has Not Shown that Common Issues Predominate over Individual Ones

The predominance criterion is "far more demanding" that Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997). "This inquiry begins with an examination of the substantive elements of the class claims . . . and the defenses raised." *Vodak v. City of Chicago,* No. 03 C 2463, 2008 WL 687221, at *3 (N.D. Ill. Mar. 10,

2008). If proof of the essential elements of the claims will require individual inquiries, then class certification is inappropriate. *Reed,* 2009 WL 3146999, at *4.

To establish liability under the IMWL, each Admissions Advisor must prove three things: (1) she performed work that was not recorded on her timesheets; (2) KU required or knowingly permitted that work to be performed; and (3) she was not paid for that work. *See Bjornson v. Daido Metal U.S.A., Inc.,* 12 F. Supp. 2d 837, 842 (N.D. Ill. 1998). Each employee would also need to prove that she worked more than 40 hours during the week in which the alleged off-the-clock work was performed. 820 ILCS 105/4a(1). Highly individualized inquiries would be necessary to determine whether any of these elements were met.[4]

There is no way to determine whether any Admissions Advisor failed to record all time worked without specific testimony from that individual employee. As discussed above, the alleged practices that led to any underreporting of hours varied, and the vast majority of the declarants reported, and were paid for, all time worked. *See Driver,* 265 F.R.D. at 315-16 (predominance requirement not met where the reasons for the off-the-clock work varied).

Each Admissions Advisor would also need to show that KU required or knowingly permitted the alleged off-the-clock work to be performed. *See Bjornson,* 12 F. Supp. 2d at 842 (dismissing IMWL claim where supervisor did not observe work employee failed to report). Wyer states that one supervisor told him (on one, unspecified occasion) that he would not be paid for handling calls after his shift. (Wyer Decl. ¶ 16). *See Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (directions of a "rogue" manager cannot justify certification under the FLSA's more lenient

---

[4] Slayton's claim for a class under IWPCA -- under which class members would have to show that KU failed to pay them for all wages "earned" (i.e., "compensation owed an employee by an employer pursuant to an . . . agreement between the 2 parties," 820 ILCS 115/1 and 3) – would require similar individualized inquiries.

14

standard). Slayton, on the other hand, asserts that she was "discouraged" from recording time, but admits that none of her supervisors ever told her not to record any time. *See Brumbelow v. Quality Mills, Inc.,* 462 F.2d 1324, 1327 (5th Cir. 1972) (dismissing claim where manager did not direct plaintiff to work off the clock). Either way, individualized inquiries of both Admissions Advisors and supervisors would be required.

Slayton also has failed to propose how each putative class member's alleged damages could be calculated on a class-wide basis. *See Reed,* 2009 WL 3146999, at *22 (predominance requirement not met where damages were not susceptible to common proof). For example, Slayton claims that it took her 10-15 minutes to log into her computer applications; but that process took others only 30 seconds to complete. Thus, even if some Admissions Advisors failed to record their log-in time, there would still need to be individual proof as to how long the process took and, given the minimal amounts at issue, whether it was *de minimis* and therefore not compensable. *See Gonzalez v. Farmington Foods, Inc.,* 296 F. Supp. 2d 912, 929 (N.D. Ill. 2003) (discussing *de minimis* doctrine).

### B. Plaintiff Has Not Established that Class Treatment Is Superior

"If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient." *Murry v. America's Mortgage Banc, Inc.,* Nos. 03 C 5811, 03 C 6186, 2005 WL 1323364, at *3 (N.D. Ill. May 5, 2005). Because neither liability nor damages turns on a common issue, resolution of Slayton's putative class claims would entail separate trials for each class member. Nor is representative testimony an option, given the varying accounts between Slayton and other declarants. Accordingly, there would be no judicial efficiency in certifying her proposed classes.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for class certification should be denied.

15

Dated: September 3, 2010                    Respectfully submitted,

                                                          IOWA COLLEGE ACQUISITION CORP.

                                                          By: _s/ Arthur J. Rooney_____
                                                                 One Of Its Attorneys

Michael R. Levinson (mlevinson@seyfarth.com)
Noah A. Finkel (nfinkel@seyfarth.com)
Arthur J. Rooney (arooney@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, IL  60603
(312) 460-5000

16

12654495v.5

**CERTIFICATE OF SERVICE**

Arthur J. Rooney, an attorney, hereby certifies that on September 3, 2010, he caused true and correct copies of the foregoing to be served via the Court's electronic filing system on the following attorneys of record in this matter:

> Jeffrey Grant Brown
> Peter E. Converse
> Catherine P. Sons
> Converse & Brown, LLC
> 35 East Wacker Drive
> Suite 650
> Chicago, Illinois 60601

        s/ Arthur J. Rooney

12654495v.5